Yes, sir. So this is the second time around for both of these firms, right? Thompson Co. and Strasburger, based on the reliable finance case? Yes, Your Honor. I'm not sure if Thompson Co. is in the appeal on receivable finance, but certainly the Sabian Law Firm is. They're listed in the New Circuit report. So, I don't know, I just thought it was interesting. And that's a good point that the result ought to be the same, because the same players. May it please the Court and counsel, our briefing covers a variety of issues, many of which would justify reversal and rendering a take-nothing judgment. I plan to focus on reliance and damages. There's only one fraud or misrepresentation issue that was submitted to the jury and which is before this Court on appeal, and that is whether the defendants, whether the chiropractors misrepresented to the plaintiffs, to Allstate, that the chiropractic treatment was reasonable and necessary. And on that issue, there is zero evidence that any Allstate representative, any Allstate adjuster who actually worked on any of these 700 claim files actually relied on any statement, any bill or any other statement made by the chiropractors that the care was necessary. There are a variety of components, subsets to that general proposition that demonstrate that Allstate failed to prove fraud on that issue. First of all, the only— It's not fraud. Technically, it's wire fraud, right? It's wire fraud, but obviously, fraud is part of wire fraud, and while not specifically defined in RICO, it's still fraud, and it was defined by the Court's charge as such. Remind me what case says that wire fraud, the elements of reliance in wire fraud are exactly the same as in the parallel, say, state cause of action. I mean, use of the measure to defraud— Sure. The 2008 Supreme Court case in Bridge addressed the issue of reliance, and while the Court said that reliance is not a specific element in RICO because it literally does not appear in the statute, that reliance, either by a first party or a third party, in most cases will be required to show but for causation, which is a specific element of RICO, and this is one of those cases. This is a normal party-on-party alleged fraud case. It's not the sort of exotic situation where the plaintiffs, as in Bridge, were not directly involved in the chain of causation. Here, Allstate was. It was, in a sense, the last line of defense against fraud, and its actions, its reliance or lack of reliance, are germane to the issue of whether there was causation under RICO. The bills, which is what Allstate primarily relied on as constituting the representation that the care was not necessary, are absolutely silent on that specific point. They're— Unlike receivable finance, we do have at least some adjusters who testify, so I think clearly there's more evidence than receivable finance. I guess the question is, is that more enough? You rely on the language that there has to be a significant number of adjusters, and I guess I'm just trying to figure out how many you need. I mean, we already have a five-week trial here. How long are these trials and these types of cases going to last? It's almost a situation where the greater the fraud—I mean, if they had alleged there were thousands of claims that your client had resulted in them fraudulently paying, you're just going to create even more insurmountable hurdles. So I'm just curious where you think the line is that would have given a significant number of adjusters. Here we have, what, a little under 10 percent, 6 or 7 percent, and you're saying that's not enough. Sure, 7 percent. Well, first of all, of course, we do have that language in the receivable finance case. That wasn't directly an issue in the case, and that's sort of the court's lifeline that they threw out to Allstate. But I don't think, in the first instance, that language necessarily supersedes the authority of the Sandwich Chef case and the UFCW case that says generalized proof of reliance is insufficient. It's not probative. But if there were a— But those are class action—you're relying on class action cases where there are hundreds, potentially thousands of plaintiffs, so potentially thousands of different people who are relying in different ways on information. Here we have one plaintiff. I know there's a lot of claims, but isn't it different that you have only one plaintiff whose mind you have to get into, and you can look at their practices and procedures, whereas in a class action, you've got so many different people with different interests? It's literally different in the sense that it's not a class action, a true class action, but it is essentially a class action because you have a whole bunch of claims bundled together. But only one plaintiff. Not a class action. Only one plaintiff. Very confusing. That is a misleading definition. What you have here is one plaintiff defrauded thousands of times, allegedly, by this RICO scheme. Here are the differences, or here are the reasons why the reliance evidence, just like it was in receivable finance, is insufficient. There were four adjusters that testified. Even those four were inconsistent as to what they supposedly relied on or didn't rely on. Cottrell didn't offer any testimony about reliance on clinic bills or clinic records. The other three, Campbell, Marks, and Seppalveda, testified only that they relied on the bills and the clinic records to indicate what the services were that were provided. For reliance to be material, it has to be reliance upon a misrepresentation. There was no issue that the services generally described in the bills were provided, the adjustments, the electrical stimulation, and so forth. In addition, there are other inconsistencies among the four that testified. For example, Campbell testified that she would not have included amounts for first-day exams had she been aware of a disclosure form. But Seppalveda, another Texas adjuster, testified that she would have paid for the first-day exam based on the signed 10-point form. In addition, you have another of the claim files, patient number 240 or claimant 240, where there were 44 different adjusters that had awareness of a payment policy form and the disclosure statement, which two of the testifying adjusters said they would have looked at and acted differently had they known it was there. You got all those adjusters in the claim 240 who have that form and still are acting inconsistently with the testifying adjuster. Well, let me ask, I mean, on one level, inconsistencies are for a jury to resolve, but let me plumb a few possible differences between this and receivable finance company. Is it not correct that receivable finance is clearly not pled as a RICO case, but you don't have this . . . it's not at the surface of the case, let's say, as it is in the current one, how you had the integration between the chiropractors and the telemarketers and the lawyers, right? So that there's a lot more detail in this case about the setup of these clients for . . . to get money out of Allstate, right? If you just read receivable finance, that was just the clients would walk into the chiropractors and then the chiropractors would see a likely . . . or whoever the defendant was would see a likely way to fleece Allstate and they'd set things up for a settlement and claims and so on. But here, you have the perpetrators seeking out would-be claimants, right? And then disguising how they're seeking them out before they get these fake diagnoses and so on, right? I would say that . . . I know you contest that, but that's what the jury found. The jury found liability on a general RICO charge. Well, right, but it was based on all these facts, right? It was based on allegations. There were no . . . Well, there had to be proof of what telemarketers were . . . and I know there were some of that excluded and so on, but, I mean, that's all in the record, is it not? It wasn't in the record that went to the jury and it's not evidence that supports the verdict. Well, why bother to set up these ten-point forms, right? Because those were the ones that were disguising what the origin of the plaintiffs coming into the chiropractors were, right? No, the ten-point form was simply a document that told the patient that the chiropractor was going to perform these initial screening tests and examination, and if it was determined that care was warranted, then all charges after that would not be free and would be charged and then the patient signed that form. Yeah, but they had also been told that they weren't going to pay anything. That was an allegation by Allstate. There was no patient that testified . . . Well, your client, yeah, well, there was a spoliation instruction to the jury also. Spoliation instruction primarily dealt with testimony that emails regarding the manner of payment of telemarketers was destroyed and that was the basis of the spoliation evidence. There was no spoliation argument that there were records destroyed of what was told to the jury that provided any evidence that they were deceived. There were no records of patient communications, many of which were in the Allstate files and the . . . So your representation as you stand here today is that nothing that your clients did was even arguably shady. The court may look at facts that Allstate induced at trial as being distasteful or disagreeable or actions that the court might not do in business, but my point is this, that those circumstances do not bear at all on the issue of reliance, do not bear at all on the issue of damages. In a sense, no matter how sneaky they were . . . The point is to me that the Bridge case suggests that reliance can be proven in different ways and when you have evidence before the jury that the whole thing was a very elaborately constructed sham to create customers for the chiropractic service and then perform treatments on them that were not necessary, and the jury clearly understood this because they distinguished between the kinds of x-rays that were performed, among other things, that, you know, Allstate . . . either Allstate was totally stupid for paying any claims or else they were relying in some degree to pay some amount on them. Now, in addition to the fact that no Allstate representative, no Allstate witness testified, I relied on these bills that they were representing to us that the care is reasonable and necessary and that's why I paid the claim or that's why I offered anything for chiropractic. A, there was a complete absence of that testimony and more telling is that the opposite was manifestly proven to be true and admitted by the Allstate adjusters. I didn't take the bills at face value. I didn't believe it. I did . . . I ran everything through MBRS. The logical extension of your argument is that health care fraud can never be proven because a third-party payer always tries to conduct a review within the limits of their own resources. Now, I mean, maybe that's . . . I mean, I'd be really surprised if that were the case and I think reasonable finance at the end of it indicates that's not the case. I'm not suggesting that there could never be health care fraud, but . . . No, I'm saying you can't prove it. What you're arguing is that the third-party payer that does . . . has methods to review the claims that are made upon it has no way to testify to individual reliance. That's what you're saying. No, I'm saying on a case-by-case basis, you have to look at what actually happened to see whether they were really tricked or fooled. So then we . . . well, so then we get back to what Judge Costa said, that reliable finance says they could have put adjusters on to testify in a significant number. And Allstate's going to get up in a minute and say, we put adjusters on to testify in a significant number. I understand that, but again, the adjusters that testified didn't testify on the only material issue. Now, let me just mention one other thing here because I hope that the parties learned from the reliable finance case. I mean, obviously the case was pled differently. It apparently was proven differently. It apparently does not have as much of the overlay of judgments, settlements as the previous case did. And so what the court notes in receivable is that it had to do a great deal of delving into the record on its own. And in fact, the court had asked both parties for additional briefing on reliance and damages. And I'm trying to be . . . I'm just trying to say something here. If there are additional parts of the record on which you wish to rely to show that there was no evidence of reliance, you're both free to submit post-argument briefing because this was a five-week trial. That was only a three-week trial. I'm sure there's a wealth of stuff in there. In our initial brief, Your Honor, we made the statement that there was no reliance, no evidence of reliance. We gave lengthy record designations of conduct by Allstate which inherently negates reliance. In their brief, the Allstate parties did not identify any testimony from any adjuster who said, I relied on the bills or the records as representations that the services were necessary. Allstate's had that opportunity. Not the x-rays? The testimony about the x-rays really isn't exactly the same issue. And the testimony on the x-rays was inconsistent. For example, Cottrell said nothing about the x-rays. I thought their expert, though, said that the x-rays was the clue. And obviously, that's what the jury found most compelling given the claims they found liability on and the claims they rejected. Sure. And of course, with the x-rays, the evidence is undisputed that none of the enterprise members had any knowledge of any bad x-rays or any blurry x-rays or any of that sort of thing. So there's that evidentiary burden that hasn't been satisfied. But it still comes back to reliance. Cottrell didn't, I mean, Cottrell didn't testify that he relied on x-rays to do anything. Campbell testified that she expected the x-rays were diagnostic, but she didn't give any, testified any consequences of those expectations. Marks gave no testimony about the x-rays being diagnostic. And even if there was anywhere to go on that, that still wouldn't justify the damage award because the x-ray charges were a very small portion of the allowed amount, which was the jury verdict. They recovered 100% of the charges of the so-called allowed amount, not just the charges for the x-rays. Okay. We have time for a vote. Thank you. All right. Mr. Crosnow. May it please the court, counsel. Um, my name is Wade Crosnow and I represent the Allstate, Appalese, and Cross Appellants. The defendant's strategy from the outset of this case has been to portray it as a repeat of the receivable finance case. Why don't you move directly to telling us what was the evidence of reliance? Because that's what Mr. Stein opened with and placed his emphasis on. Well, one difference between this case and receivable finance was that... I'm not asking you about receivable finance. I'm asking you in your case, what was the evidence of reliance? We presented evidence from adjusters who handled a total of 39 of these claims, who testified that they relied on the medical bills and records. They also testified that they were familiar with the general claims handling practices at Allstate and that other adjusters handled claims similarly. All right. Mr. Stein's statement, I don't mean to interrupt your train of thought. I want you to say whatever you want to say, but my notes from what Mr. Stein said was that there was no evidence that Allstate relied on a statement from the chiropractors that the treatment was necessary. Can you address his specific contention? Their testimony of the adjusters was that they relied on the bills and medical records, which included narrative reports, making representations about the treatment being reasonable and necessary. There were also admissions by the defendant that bills are representations that things like x-rays were taken and are diagnostic. So there were admissions on that point, and their experts agreed with that too, that when you're billing out x-rays and including them in bills, that's a representation that they were taken and that they were diagnostic. Didn't a number of the adjusters state that they relied on the certification from the patient saying that they were going to be responsible for their own bills when, in fact, there was evidence that wasn't the case? And if they had known that the patients were not going to be on the hook, that that's a fraud indicator? There was also testimony that there was reliance on that, that the patients were personally responsible, and that all the state didn't know that patients were actually signing off on payment policy forms that would indicate they were not responsible, and that it was the policy, the written policy from the chiropractic manual, to tell people that if they asked about statements that they were signing, to tell the patients that they were not personally responsible. The other side says the only reliance that should matter is whether these were reasonable and necessary chiropractic expenses. What's your response to that? So even if there's this issue about whether the patients were supposed to pay or not, that that's immaterial? There were a number of reliance theories, and one of them was the reasonableness and necessity of the treatment. One of them was actually the representations about personal liability on the bills. That part of it, the district court granted judgment as a matter of law on. But there was also a theory just about general misrepresentations to patients. I mean, we have chiropractic scripts in the record that the testimony was that the telemarketer – I mean, we have telemarketer scripts that are in their manual that were produced to us, and the testimony was that the telemarketers were supposed to follow those, and they were – If we found there was reliance and upheld the verdict on that issue because of this third-party reliance, which we know we can do in a RICO case like this because of what the patients were told, does that affect the damages? Because then isn't there still a damages question of what would have been the reasonable payments? Well, the Supreme Court has not fleshed out that third-party reliance issue and what exactly that means. Certainly, those representations telling people things like that you could be injured and not know it, you need to come in for treatment, you won't have to pay for the treatment, those are things that were essential in bringing in people to the door and getting them into this scheme where the purpose was to generate bills and not to render treatment so much as to generate bills that could be used in personal injury claims that would be submitted to Allstate. So ultimately, bringing people in the door did cause damage to Allstate. We feel like because it started this process that led to payment of the claims. We also feel like we proved through our chiropractor testimony that the services were not reasonable and necessary and that there was no value to them. So we feel like we proved both in this particular case. And going back to a comment that Judge Jones made, I think one distinction here between receivable finance in this case is that you do have evidence of not just chiropractic treatment that was unwarranted but a start-to-finish process where the defendants had control over the telemarketers who were bringing in people in the door, telling them things like you could be injured and not know it, and also had control over the management of law offices. And by management, I mean the actual funding of law offices and the actual handling of claims by these management companies, handling and settling claims with Allstate. And the testimony was that there was nobody at these management groups, like the professional management group and the law office network, that had any, that were attorneys at all. So they were handling claims. And then in receivable, there were attorneys involved, but I guess that there wasn't this overall, was there an overall conspiracy? It wasn't, certainly wasn't of the same type as this one. I think . . . I mean, because the court condemns what it saw as the shady practices with lawyers involved. But . . . I believe, Your Honor, that the facts in that case was that there were referral relationships in place. I don't recall there being evidence of actual management . . . Collusion or something like that, or handling . . . Funding . . . Right, no. An actual handling of . . . Let me ask you, how much of the damages in this case arise out of settlements of claims? Because receivable finance talks a great deal about the fact you can't disaggregate the medical costs out of the general settlement. But the court tried to avoid that here, didn't she? Yes, yes. There was . . . Is the court asking about the settlements versus judgment issue? I'm trying to ask how were the damages for . . . Well, I guess judgments would have been included in the fraud here, wouldn't they? There were not judgments. These were settled. They were settlements, okay. The other one said, you know, mishandled claims for medical expenses, right? There were a bunch of settlements that would have included property damage and so on. Are these settlements here similarly aggregated to include non-compensable damages, non-compensable payments that Allstate made? No, Your Honor. And you had asked about record sites, and I think it's probably best to refer you generally to the pages of our brief that discuss this evidence. But at pages 42 through 45, we talk about how there is proof in each claim file of the amount that was allowed toward payment of the chiropractic bills and included in the settlement. In other words, what Allstate's specific out-of-pocket loss was for these chiropractic charges as opposed to other elements of damages that might . . . general damages that might have been included. We also, and this is another distinction from receivable finance, presented expert testimony from chiropractors who've reviewed every one of the patient files and opined that the chiropractic care was not warranted. And I also think it's important for the court to recognize here that this was not a runaway jury verdict that where the jury gave Allstate everything it wanted. We felt like we proved our case to recover on all of the claim payments we made. But the jury saw things a little bit differently, and this was a jury that according to even the attentive throughout the trial and also completed a jury verdict that to say the very least was extremely challenging. This jury persevered to do that, and no jury verdict should be lightly taken away by an appellate court, but this one especially not. And when I say that this was a targeted jury verdict, it comes back to this issue about was the strongest. It was in fact overwhelming and virtually uncontested. The jury here saw numerous examples of x-rays that were totally white, totally black. What about his argument that these particular defendants had no knowledge of those bogus x-rays? Well, that's what they say that Dr. Planbeck admitted at trial, and this is cited in our brief, that he was personally responsible for the missing x-rays and for the non-diagnostic x-rays. He also testified about his participation in drafting the CSG chiropractic manual that emphasized the use of x-rays to convince people to begin treatment. He also was personally involved in training these chiropractors here at the CSG offices in Kenner, Louisiana. Let me just ask you, did anyone ever refer this to the U.S. attorney? Your Honor, I was not involved until closer to the trial of this case as appellate counsel. I did sit through the trial, and I do not know the answer to that question, but I can find out. No, I'm just wondering. You're curious, right? But I apologize. I do not know the answer to that one. You also had here that you had defendants' own chiropractors admitting that these x-rays were, many of them were non-diagnostic, and this is extremely telling. Their retained experts were never provided the x-rays by the defendants, so they couldn't comment on those at trial. So that's why I say the evidence was virtually uncontested on that. You also had Dr. Planbeck and other defendants admitting that bills are representations that the x-rays were taken and non-diagnostic. Excuse me, that x-rays were taken and that they are diagnostic, and admitting that insurers rely on such representations. Now, the defendants are now arguing on appeal that these x-rays really had nothing to do with whether people were treated or not, and it was just used to indicate contraindications to treatment. But that is belied by the fact, again, you go back to their manual. If you look at Plaintiff's Exhibit 715 at pages 1281 and 82 and 1490 and 1491, the evidence was that x-rays were used to convince people to treat. There was also testimony about x-rays having dots and lines and dashes that were drawn on them by chiropractors to convince people, look, you've got a problem here that needs to be treated. Examples of that, we would cite you to Plaintiff's Exhibits 336F and 504F. And even when the testimony from the experts was that these x-rays were non-diagnostic, you would see these lines and dots and circles being drawn on the x-ray. So they were using them to convince people to treat, and now they're turning around on appeal and saying they don't have anything to do with treatment. One other thing here, and this is significant, is that the defendant's own expert admitted it is difficult to make a diagnosis without a good x-ray if the chiropractor deems x-rays necessary. And in a large number of these cases, their own chiropractors deemed the x-rays necessary, and we either don't have them or the evidence was that they were non-diagnostic. Do you want to address the issues on your cross-appeal, like attorney's fees or prejudgment interest? Yes, I would like to do that, Your Honor. The issues, briefly, on attorney's fees and prejudgment interest. On prejudgment interest, this Court has a strong presumption in favor of prejudgment interest. That's what it said in the Ocean Bulkships case, and it has also said that prejudgment interest should be awarded on all past damages involving a some certain, and that's exactly what we did. What about a case with treble damages? I mean, the district court didn't give a lot of discussion to this, but she cited a case that's saying when you have treble damages, because that's making the plaintiff more than whole, you don't have to worry about the normal function of prejudgment interest, which is to make sure the plaintiff is put back in the same position it would have been. We believe that that reasoning is contrary to this Court's decision in the Abel case that is cited in our brief. In the Abel case, this Court not only affirmed an award of what it called judicial interest on treble damages, but it also, in addition to that, in addressing another issue about whether there was some sort of double recovery involved between RICO damages and some securities fraud damages, the Court wound up saying that one-third of a RICO treble damages award is compensatory or remedial, and that the remaining two-thirds is penal in nature. And so— I remember that opinion well. It's one of the first ones I ever wrote. Maybe I've learned a lot since then, or I don't know. Well, we think that reasoning was correct, Your Honor, and what it shows here is we only asked for an award of prejudgment interest on the compensatory portion of the award, and if the remaining two-thirds is intended to punish or deter, then obviously the purpose there can't be to compensate and shouldn't be considered for compensatory purposes. Do you have a ballpark figure of how much it is? I'm just curious. At the time of trial, it was something like $248,000, and we can provide a calculation for the Court if it wishes. On the issue of attorney's fees, the district court's reasoning here was essentially she took a mathematical approach that you only—all state, you only prevailed on 50% of your underlying claims, so you only get 54% of your attorney's fees, but there's not any authority that The Supreme Court has specifically said that attorney's fees, you can't take that sort of mathematical approach. That's what it said in the Hensley v. Eckerhart case, and what should have been looked at is the overall level of success that was obtained here. All state prevailed on both RICO theories against all defendants, recovered $2.8 million in treble damages, and it simply wasn't possible to segregate on the basis that the district court ordered on trying to segregate your attorney's fees based on how much time you spend on each underlying individual claim, and so you should look at the overall level of success obtained. You're not really challenging—I mean, I assume she applied Johnson for—you gave her lodestar figures at some point. So really, it's an abuse of discretion standard, isn't it? It is an abuse of discretion standard, but there was no challenge made by the defendants that we spent too much time on any issues or that our rates— Well, obviously, you were having big discussions with the court about the way in which you'd the fraud issues and so on, so it is very likely in her mind that you didn't prevail on the fraud issue, even though you got a ruling on it. You couldn't prove up sufficient damages, or the jury didn't think so. So from that standpoint, she could have reasonably thought you weren't prevailing. Well, and that was another subject to the part of our conditional cross-appeal. But the interesting thing is that if you look back at what they argued in their response to our motion for attorney's fees, and then you look at the district court's opinion, the district court wasn't saying segregation was required based on the fact that there would be separate fraud and unjust enrichment claims, which in a lot of ways had similar issues and common core facts with the other claims. The court was ordering segregation based on the fact that we didn't prevail on all of the underlying claims. Your Honor, one other point I want to mention about this spoliation issue, which we think is an alternative basis to affirm here. Mr. Spine said that there was not evidence that telemarketing records were destroyed that was part of that issue. There was evidence, specific evidence, that records were kept, including recordings of telemarketing calls and other telemarketing records, that we didn't get those in this case, and that Dr. Planbeck ordered his IT director to destroy telemarketing records. And we've cited those in our brief. If you look at pages 39 and 40 of our brief, that evidence is there, and that's an alternative basis to affirm. I see that I'm out of time. We have some additional conditional cross-appeal issues that we've raised, and if the court has any questions, I'm happy to answer them. No, those are self-evident. Thank you very much for your time. Okay, thank you. I want to address the damages component of the case. Allstate settled all these 700 claims with a single settlement check. There was no itemization. Allstate admitted that the settlement included payment for multiple elements, including pain and suffering, past and future, lost wages, mental anguish, a poor venue, Allstate insured was DWI, and so forth. So, at the most threshold level, there's no evidence of what Allstate paid, if anything, for the so-called improper chiropractic charges. As the case law we've cited, including the case of this court, is clear by analogy, at least, a unilateral declaration is insufficient to establish that amount as a matter of law. In addition, the whole damages model is completely speculative, as reflected by the state court opinion in Rehab Alliance. There's no evidence as to what would have happened had either there been no chiropractic charges, what the settlement would have been, or had Allstate discovered the fraud, had they hired Dr. Timberlake before a claim was settled, and he said, no, these charges are all fraudulent. And so Allstate told the claimants, well, you've got a $3,000 claim, we've got $2,500 allowed amount, we're only going to pay you $500.  So, their entire damages model was completely speculative, and as the case law makes clear, speculation won't support a damages recovery. When a defendant's challenging reliance, and there's all this, at least, evidence the jury found of various attempts and machinations to create a fraud scheme, I mean, it begs the question of why do all this if it doesn't make a difference at the end of the day? If it didn't affect what Allstate did, why go through all this stuff that involves exposure to a criminal statute if, oh, Allstate would have paid it anyway, this didn't make any difference, all these bogus x-rays and all these lies to patients about whether, you know, what they were going to have to do, what their obligations were? I understand the court's sense of the testimony about the patients, but there really was no direct evidence. The manual is an inanimate object. There wasn't even proof that it was given to all the treating chiropractors. There's no chiropractor who testified that that chiropractor dealing with the patient made any such statement. And, of course, it's not even in the case because the court granted judgment on that. Well, my understanding is that Allstate had an internal itemization for each settlement and it calculated the specific amount it owed for chiropractic services. It did have an internal itemization, and there are even cases among the 390 verdict claims where that internal itemization is more than the settlement amount. So it couldn't possibly. They also dropped 120 cases. Well, that just means that if it's more than the settlement amount, that means the settlement amount is less than the damages from unauthorized, unnecessary chiropractic care. Sure, that begs the question, how could they possibly be damaged by more than they settled for? They dropped 120 claims during trial where that was the case. But I guess I'd analogize it to this. Let's say you go into a jewelry store and you look at two stones, and the seller says I'll sell you both of them for, I'll say one for $10,000, one for $5,000. You negotiate and you end up buying both for a single amount of $3,500. I don't disagree with what you're saying. What you're trying to do is to put this back in the mold of receivable finance, where they make exactly that point. That's why I was asking him about the judgments. It is exactly like receivable finance. Except that they're saying that they had more precise evidence in this case. They had the internal itemizations, which again, we say as a matter of law is insufficient. But the evidence that they present on damage is separate from the same weakness and fatal weakness as in receivable finance, which was this. In receivable finance, the court said that Dr. Timberlake said that some percentage of the MRIs was reasonable, and Allstate did not distinguish between the reasonable and the unreasonable, or the fraudulent and the legitimate. The same thing was here. The Allstate doctors who testified, the Allstate experts said at least some of the care was reasonable. Allstate never distinguished reasonable care from unreasonable care, yet the award is 100%. And so they failed in exactly the same way they failed in receivable finance to prove damages. They never isolated. Do we need to go through every one of the 300 and some claims on which judgment was entered in order to determine that? No, because the record is that at least some was reasonable, and it was Allstate's burden. This may have been a difficult case to prove because they essentially bundled 700 individual fraud cases together, put them on trial at once. That's a burden of Allstate's choosing. It's not the defendant's fault that Allstate brought that type of case. It's not the court's fault. But at the end of the day, if it failed to prove the elements of those individual fraud claims, then the judgment can't stand. The only other thing I'd say is I'd ask you, does your brief have sufficient record citations that we would be able to discern this from your brief? Yes, Your Honor, absolutely. All right. Thank you. Thank you.